FILED
SUPERIOR COURT
OF GUAM

2021 FEB 11 PM 3: 28

CLERK OF COURT

BY: _____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| IN THE MATTER OF THE GUARDIANSHIP<br><br>OF<br><br>CHRISTINE QUICHOCHO,<br><br>Adult,<br><br>BY<br><br>OFFICE OF THE PUBLIC GUARDIAN,<br><br>Petitioner. | **Superior Court Case No. SP0224-20**<br><br><br>**DECISION AND ORDER** |

In this guardianship proceeding, the Court considers whether the Public Guardian has the authority to make an end-of-life decision. Under the unique circumstances of this case, the Court finds that the Public Guardian has such authority and that she should proceed to consider that decision concerning the Public Guardian's ward, Christine Quichocho.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The Public Guardian serves as guardian over Christine Quichocho. Order Appointing Guardian (Dec. 22, 2020). Ms. Quichocho has suffered from COVID-19, a miscarriage, acute respiratory failure, and a hypoxic-ischemic brain injury secondary to cardiac arrest. Pet. ¶ 4 (Dec. 7, 2020). As a result, Ms. Quichocho is effectively brain dead and a quadriplegic, and her

prognosis for recovery is poor. Minute Entry (Jan. 22, 2021); Decl. Marcelene Santos, Ex. A (Dec. 7, 2020).

Ms. Quichocho is also estranged from her family. Before falling into unconsciousness, Ms. Quichocho repeatedly informed Guam Memorial Hospital officials that she did not want her family involved in her care or aware of her condition. GMH medical professionals documented the following in Ms. Quichocho's medical records:

- "She [the patient] doesn't want me to contact family at this time." Dr. Annie Bordallo on September 25, 2020, at 15:25.

- "I asked her [the patient] if she wanted me to communicate with her family about her condition and she did not wish me to do that." Dr. William Vercio on October 7, 2020, at 14:13.

- "Asked patient if there is a family member staff should call to update on condition. Patient shakes her head no, continuing to indicate that she does not want details of her care shared with family members." Registered Nurse Sharon Denise Jackson on October 9, 2020, at 19:41.

- "[The patient] confirmed that she does not want me to communicate with her family." Dr. Hidetaka Kitazono on October 10, 2020, at 17:49.

- "Asked patient if she would like this RN to call any family members to update them regarding her condition, but patient shook her head no. Verified if patient would like this RN to answer any family member's questions should they call and ask about her, but patient shook her head again." Registered Nurse Shanna Mendoza on October 11, 2020, at 11:16.

- "[The patient] got emotional while talking about her family and cried. She does not want us to talk to her family." Dr. Anu Taylor on October 12, 2020, at 13:00.

ORIGINAL

- "Family requesting to video chat with patient. Asked patient if she wants to speak with her family. Patient nodded 'no.'" Registered Nurse Isabel Flores on October 12, 2020, at 17:10.

- "Patient does not want her care discussed with anyone from her family. She has refused all zoom calls from family." Dr. Anu Taylor on October 15, 2020, at 12:47.

Decl. Kyle Damian (Jan. 22, 2021).

Given Ms. Quichocho's condition, the Public Guardian asked the Court who had the authority to make an end of life decision for Ms. Quichocho. She presented three options: the Public Guardian, Ms. Quichocho's doctors, or Ms. Quichocho's family--despite Ms. Quichocho's express refusal to be in contact with her family. To assist in making that decision, the Court ordered the Public Guardian to research if Ms. Quichocho expressed preferences regarding end-of-life decisions. The Court also ordered that Ms. Quichocho's family be given notice of these proceedings. Order (Dec. 23, 2020).

At a hearing on January 22, 2021, the Public Guardian reported that she did not uncover any evidence that Ms. Quichocho expressed any preference for end-of-life care. Members of the family also appeared, including Ms. Quichocho's siblings--Bettyann Quichocho, Martina Quichocho, Jeraldjon Quichocho, Ignacio Quichocho, and Sheena Quichocho--and a cousin, Angelina King. In response to the Court's question as to whether the family had a preference as to Ms. Quichocho's further sustenance on or withdrawal from life support, the family members individually and collectively expressed that they wish to withdraw the life support. However, the family asked to see Ms. Quichocho before she passed and for medical information to be shared with the family members so those members employed off-island can make arrangements to


ORIGINAL

travel to Guam to see her or potentially attend her funeral. The Public Guardian objects and asks the Court to respect Ms. Quichocho's wishes to sever her family's involvement.

## II.   LAW AND DISCUSSION

As a preliminary matter, the Court finds that before her incapacity, Ms. Quichocho did not execute or express any declaration as to life-sustaining treatment while in a permanently unconscious state. The Court must now consider which person or persons are authorized to make those decisions for Ms. Quichocho.

No Guam law precisely allows the Public Guardian to make an end-of-life decision. The Public Guardian statute enables the Public Guardian to serve as a guardian of elderly or mentally incapacitated individuals with the same powers and duties as a private guardian. 7 GCA § 3112. Such powers and duties of private guardians include the general care and custody of the ward and the frugal management of the ward's estate. 15 GCA §§ 3501, 4101, 4103.

A guardian and ward's relationship is confidential, meaning that the guardian acts as a trustee and holds fiduciary responsibilities. Because persons in need of guardians suffer some degree of incapacity, the Court construes that the "care" provided to a ward necessarily encompasses providing for medical care. In other jurisdictions, medical care responsibilities further extend to the decision to withdraw life support. *See, e.g., In re Guardianship of L.N.*, 237 A.3d 222, 230 (N.H. 2020) (holding that "a guardian who has been granted authority to make healthcare decisions for a ward, who is incapacitated to make his or her own such decisions... includes the authority to terminate life support for a ward in appropriate circumstances"); *In re Guardianship of Tschumy*, 834 N.W.2d 764, 770 (Minn. App. 2013) (finding that a statute granting a guardian "the power to give any necessary consent to enable the ward to receive necessary medical or other professional care... include[s] the disconnection of the ward's


ORIGINAL

life-support systems"); *In re Estate of Longeway*, 549 N.E.2d 292, 298 (Ill. 1989) (finding that where statute "specifically permits a guardian to make provisions for her ward's support, care, comfort[,] health, education and maintenance..." it "impliedly authorizes [the] guardian to exercise the right to refuse artificial sustenance on her ward's behalf"); *John F. Kennedy Mem'l Hosp. v. Bludworth*, 452 So.2d 921, 926 (Fla. App. 1984) (holding that "the right of a patient, who is in an irreversibly comatose and essentially vegetative state to refuse extraordinary life-sustaining measures, may be exercised. . . by a guardian of the person of the patient appointed by the court"); *Matter of Guardianship of Hamlin*, 689 P.2d 1372, 1378 (Wash. 1984) (reaffirming that the statutory "duties of [a] guardian ... to assert the rights and best interests of the incompetent person ... include[ ] the power to assert the incompetent's personal right to refuse life sustaining treatment").

On defining her scope of duties, the Public Guardian points to guidance from Hawaii, which enacted a similar public guardian statute. Hawaii has also adopted the Uniform Health-Care Decisions Act (Modified) ("UHCDA"), which states that a guardian shall comply with an individual's instructions and shall not revoke a pre-incapacity advance health-care directive unless expressly authorized by a court. Haw. Rev. Stat. § 327E-6 (2019). The comment to the UHCDA reinforces respecting an individual's preference. However, a guardian may also make decisions in consultation with the patient's healthcare providers without outside interference. UHCDA § 6 cmt (available at https://www.uniformlaws.org).

Guam's Natural Death Act ("NDA") similarly emphasizes respecting an individual's autonomy. The NDA enforces an individual's right to make life-sustaining treatment decisions and avoid treatment not desired by such person in a terminal or permanently unconscious condition. Within the NDA, the Guam Legislature expressed that "an adult person has the

ORIGINAL

fundamental right to control the decisions relating to the rendering of his or her own medical care, including the decision to have life-sustaining treatment withheld or withdrawn in instances of a terminal condition or permanent unconscious condition." 10 GCA § 91101. The NDA also recognized the role of family: "The Legislature further finds that the family should be encouraged to openly express their opinion and concerns with the individual. [The NDA] recognizes the importance family plays in supporting the decision of the individual." 10 GCA § 91101(g). However, the NDA does not address or encompass situations like the present when one has made no pre-incapacity declaration or situations involving guardians. *See* 10 GCA § 91112(d) ("This Act creates no presumption concerning the intention of an individual who . . . has not executed a declaration with respect to the use, withholding, or withdrawal of medical treatment.").

Of the three potential options,[1] the Court will first address and rule out the option that places the end-of-life decision in the hands of Ms. Quichocho's family. At the two hearings in this case, Ms. Quichocho's family members have appeared and demonstrated their affection for their sister. The Court has no reservations in finding that the family can set aside whatever has caused a chasm between themselves and Ms. Quichocho and act in her best interests.

However, on no less than eight occasions, Ms. Quichocho insisted that her family not be made aware of her condition or involved in her care. Respecting familial preferences may align with the spirit of Guam law under the NDA, but individual preferences supersede any family desires. While the Court is sympathetic to the family's desire to be involved, it will uphold Ms. Quichocho's fervent wish to be detached from them. This includes affirming the Public

---

[1] A fourth potential option not raised by the Public Guardian places the decision within the discretion of the Court. Neither the UHCDA or the NDA favor this option. 10 GCA § 91101(e); UHCDA § 6 cmt ("courts have no particular expertise with respect to health-care decision making").

ORIGINAL

Guardian's intention not to share medical information that may be used for family members to take off work to visit Ms. Quichocho at the hospital or attend her funeral.

The remaining options leave the end-of-life decision either with the Public Guardian or her doctors. The Court does not doubt that the medical professionals involved in Ms. Quichocho's care would make reasoned, sound decisions based on medical factors. But placing this decision unilaterally in the hands of doctors takes away from individual autonomy. As the NDA recognizes, individuals should be empowered to make these ultimate and likely irreversible decisions for themselves even when contrary to medical advice. And as the UHCDA recognizes, when a person cannot decide for herself, a guardian shall.

Under the circumstances, it is necessary to confirm that the Public Guardian's role here includes deciding Ms. Quichocho's potential end of life care. The Public Guardian must continue to advocate for her ward and not delegate her fiduciary duties even to proficient medical professionals.

## III.    CONCLUSION AND ORDER

The Public Guardian shall prepare a report to the Court, which summarizes whether Ms. Quichocho's life-sustaining treatment shall continue. The report is within fourteen days of this Decision and Order.[2]

The Public Guardian is further directed to provide a copy of this Decision and Order to Ms. Quichocho's family members.

SO ORDERED this 11th day of February 2021.



HON. ELYZE M. IRIARTE
**Judge, Superior Court of Guam**

---

[2] The Court's request for this report does not imply that the Public Guardian needs the Court's consent prior to making an end-of-life decision. That issue has not been raised before this Court.

ORIGINAL